IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INSIGHT EQUITY A.P. X, LP, d/b/a
VISION-EASE LENS WORLDWIDE,

Plaintiff,

v.

TRANSITIONS OPTICAL, INC.,

Defendant.

Civil Action No. 10-635-RGA

## MEMORANDUM OPINION

Robert W. Mallard, Esq., Alessandra Glorioso, Esq., Dorsey & Whitney LLP, Wilmington, DE;
George G. Eck, Esq. (argued), F. Matthew Ralph, Esq., Dorsey & Whitney LLP, Minneapolis,
MN; Alex Iliff, Esq., Dorsey & Whitney LLP, New York, NY, attorneys for Plaintiff.

Chad M. Shandler, Esq., Richards, Layton & Finger, Wilmington, DE; Jonathan M. Jacobson,
Esq. (argued), Chul Pak, Esq., Jeffrey C. Bank, Esq., Daniel P. Weick, Esq., Wilson Sonsini
Goodrich & Rosati, New York, NY; Lisa A. Davis, Esq., Wilson Sonsini Goodrich & Rosati,
Palo Alto, CA, attorneys for Defendant.

June *30*, 2016

1

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Before the Court are Defendant's Motion for Summary Judgment (D.I. 38) and related

letters and briefing (D.I. 38, 57, 93, 139); Defendant's Motion to Exclude (D.I. 98) and related

briefing (D.I. 99, 108, 115); and Plaintiff's Conditional Cross-Motion to Exclude Transitions

Optical, Inc.'s Summary Judgment Evidence (D.I. 111) and related briefing (D.I. 112, 115, 116).

The Court heard oral argument on June 1, 2015. (D.I. 132). At the request of the Court, the

parties submitted updated hyperlinked briefing with citations corrected to reflect the docket.

(*See* D.I. 137, 138). For the reasons stated below, Defendant's Motion for Summary Judgment

(D.I. 38) is **GRANTED IN PART** and **DENIED IN PART**. Defendant's Motion for Summary

Judgment is granted with respect to Plaintiff's refusal to deal claim and denied with respect to

Plaintiff's exclusive dealing and certain state law claims. Defendant's Motion to Exclude (D.I.

98) is **DENIED IN PART** and **DISMISSED IN PART** as moot and Plaintiff's Conditional

Cross-Motion to Exclude (D.I. 111) is **DISMISSED** as moot.

## I. BACKGROUND

This matter relates to antitrust claims pursuant to Sections 1 and 2 of the Sherman Act

(15 U.S.C. §§ 1–2), Section 3 of the Clayton Act (15 U.S.C. § 14), and various state competition

laws (D.I. 63 at 130–32). (D.I. 63 at 110). Plaintiff Insight Equity A.P. X, LP, d/b/a Vision-Ease

Lens Worldwide ("VE") alleges that Defendant Transitions Optical, Inc. ("TOI") maintained

monopoly power of the photochromic ophthalmic lens market by engaging in anticompetitive

conduct of two types: (1) exclusive dealing and (2) refusing to deal with VE. (*Id.*). For purposes

of its summary judgment motion, TOI assumes that the relevant market is the photochromic lens

market and that it had market power in that market. (D.I. 38 at 18).

## A. Industry and Party Background

A photochromic lens changes from clear to dark tint when exposed to ultraviolet rays. (D.I. 61-4 at 4). Glass photochromic lenses were first distributed in North America in the 1960s. (D.I. 60-4 at 2). Lens manufacturers started researching processes to manufacture a plastic photochromic lens as early as the late 1970s. (D.I. 60-4 at 3). TOI launched "Transitions," its first plastic photochromic lens, in 1991. (D.I. 39-7 at 3–4). At the time, no commercially viable plastic photochromic lens product was available. (*Id.* at 3). As of March 2014, there had been seven generations of Transitions lenses. (*Id.* at 4). Over the years, TOI became able to apply its photochromic treatment to most lens materials, including polycarbonate.[1] (D.I. 39-8 at 24; D.I. 59 at 4).

TOI applies photochromic treatment to ophthalmic lenses but does not manufacture the lenses themselves. (D.I. 39-8 at 6, 24). Lens casters manufacture untreated lenses and sell them to TOI. (D.I. 63 at 115). TOI applies photochromic coating to the lenses and sells them back to the lens casters. (D.I. 39-7 at 2–3; D.I. 63 at 115). Lens casters distribute TOI's finished lenses to labs, retailers, or independent eye care professionals ("ECPs") such as ophthalmologists, opticians, and optometrists. (D.I. 39-7 at 3; D.I. 63 at 115). Labs grind lenses to prescriptions and fit lenses into eyeglass frames. (D.I. 63 at 115). Labs are sometimes integrated with retailers or lens casters and are sometimes independent. (D.I. 39-7 at 3). Some labs sell their finished lenses to ECPs that in turn sell finished eyeglasses directly to consumers. (D.I. 63 at 115). Retailers include national chains such as LensCrafters and Walmart, and generally sell directly to consumers. (*Id.*). TOI does not sell directly to labs, retail stores, ECPs, or consumers.

---

[1] TOI does not manufacture segmented (*i.e.*, bifocal or trifocal) polycarbonate photochromic lenses. (D.I. 59 at 4).

(D.I. 39-8 at 6).  In its briefing, TOI visually depicts the relationships between the different

players in the market as follows:



(D.I. 38 at 13).[2]

VE is a lens caster that manufactures and sells corrective lenses.  (D.I. 58 at 1–2).  VE

sells lenses to retailers and labs but does not sell lenses directly to other lens casters.  (D.I. 39-6

at 145).  In 1992, VE and TOI entered into a supply agreement pursuant to which VE purchased

Transitions lenses from TOI.  (D.I. 68-6 at 2–4).  During the 1990s, VE also began to research

implementing technology to apply photochromic treatment to the polycarbonate lenses it

manufactured.  (*See* D.I. 60-34 at 3–7).  In 2005, VE launched a polycarbonate photochromic

lens, LifeRx.  (D.I. 59 at 8).  TOI terminated the 1992 supply agreement with VE as of

September 2005.  (D.I. 58-27 at 2).

---

[2] This image, which is merely illustrative, comports with VE's description of the different entities in the
photochromic lens market.  (*See* D.I. 63 at 117).

## B. TOI's Business Arrangements

### 1. Lens Casters

Lens casters were TOI's only direct customers. (D.I. 39-8 at 6). Some of TOI's lens caster customers offered TOI's photochromic lenses in addition to other photochromic lenses. (*Id.* at 7). Some of TOI's lens caster customers offered Transitions as their only photochromic lens pursuant to exclusivity clauses in their TOI supply agreements.[3] (*Id.* at 7, 9, 30). According to VE's expert, around 70% of photochromic sales by U.S. lens casters between 2004 and 2009 were by lens casters with exclusive contracts with TOI. (D.I. 55-1 at 143). According to TOI's CEO, TOI's exclusivity agreements with lens casters were mutually beneficial because they: (1) allowed TOI to share proprietary information with lens casters without TOI having to worry that the lens casters would use the information to develop competitive products and (2) encouraged TOI to invest in promoting the benefits of photochromic products to consumers, retailers, and wholesalers. (D.I. 39-8 at 7–8). VE contends, on the other hand, that "TOI enforced exclusivity despite lenscaster objections and forced them to submit" because Transitions lenses were a "must-carry product" for U.S. lens casters. (D.I. 57 at 13).

### 2. Labs

TOI did not enter exclusive agreements with labs; however, TOI offered financial incentives to labs that promoted TOI's lenses as "preferred."[4] (D.I. 39-7 at 10–11; D.I. 39-10 at 13). TOI offered these incentives pursuant to its "STAR Laboratory Program." (D.I. 39-7 at 10). In exchange for financial incentives, a "STAR lab" would actively promote Transitions as

---

[3] TOI also partnered with lens casters that sold Transitions as their exclusive photochromic lens without a contractual exclusivity obligation. (*See* D.I. 39-7 at 7; D.I. 55-1 at 143).

[4] According to TOI's COO, TOI's exclusivity agreements with lens casters never applied to any labs owned by the lens casters and there were never exclusive or *de facto* exclusive agreements with any labs. (D.I. 39-7 at 8). VE does not argue or present evidence to the contrary. (*See* D.I. 57 at 24–25, 34–37).

its "preferred," or primary, photochromic lens. (*Id.* at 11). A lab would be in violation of the agreement if it promoted other photochromic lenses over the Transitions product, but not if it simply sold other photochromic lenses. (*Id.*). According to TOI's COO, the financial incentives offered to labs that agreed to promote Transitions as preferred were less than $1 per pair of Transitions lenses sold by the lab. (*Id.* at 10). According to VE's expert, TOI contracts foreclosed at least 60% of photochromic lens sales to wholesale laboratories each year between 2006 and 2009. (D.I. 55-1 at 189).

### 3. Retailers

TOI had both preferred marketing arrangements and exclusive arrangements with retailers. (D.I. 39-7 at 21). TOI's preferred marketing arrangements with retailers were similar to those it had with laboratories. (*See id.*). TOI offered enhanced benefits, including financial incentives, to retailers who committed to exclusively sell Transitions lenses. (D.I. 39-9 at 42; *see, e.g.*, D.I. 43-3 at 2). For example, TOI's marketing agreement with Costco contained an exclusivity condition that required that Costco not sell any plastic photochromic lenses other than TOI's Transitions. (D.I. 43-3 at 2). If Costco complied, it would receive a $1 incentive payment per pair of Transitions it sold and an additional $1 per pair to be used to market Transitions in Costco stores. (*Id.* at 3).

The parties dispute the extent of the effect of TOI's exclusive agreements with retailers. TOI maintains that it had exclusive agreements with a small number of retailers that accounted for only 12% of sales of photochromic lenses between 2006 and 2008. (D.I. 38 at 25; *see also* D.I. 39-9 at 42). VE maintains that TOI's contracts with retailers covered about 34% of the retail channel in 2006 and 2007 and about 92% in 2008 and 2009 and that most of the market foreclosure was attributable to TOI's exclusivity contracts. (D.I. 57 at 31; *see also* D.I. 55-2 at

6

70). Because VE's expert believed national retailers represented the most cost-effective means of distribution, he excluded smaller retailers from his foreclosure analysis, including only the top 50 national retailers. (D.I. 39-10 at 28–31).

## C. FTC Agreement

In 2009, the Federal Trade Commission began an investigation of TOI's business practices. (D.I. 57 at 26). Following the investigation, the FTC and TOI entered a consent order. (D.I. 41-6 at 75). As part of the order, TOI agreed not to enter into exclusive arrangements with lens casters, subject to some limitations. (*Id.* at 77, 80). TOI also agreed not to enter into exclusive arrangements with entities such as labs and retailers, unless the labs and retailers could terminate the agreements with 30 days' notice. (*Id.* at 77, 80–81). The order was a settlement and did not constitute an admission of illegal conduct; TOI paid no fines or penalties. (*See id.* at 75–89).

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of

evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323. The burden then

shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of*

*West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989).

> Parties must support their factual assertions on summary judgment by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

However, "evidence should not be excluded on summary judgment on hypertechnical grounds."

*Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989).

In determining whether a genuine issue of material fact exists, the court must view the

competent evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007); *Wishkin v.*

*Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that

a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–

49. If the non-moving party fails to make a sufficient showing on an essential element of its case

with respect to which it has the burden of proof, the moving party is entitled to judgment as a

matter of law. *See Celotex Corp.*, 477 U.S. at 322–23.

### B. Basic Principles of Antitrust Law

The Sherman Act § 1 provides that "[e]very contract, combination in the form of trust or

otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

foreign nations, is declared to be illegal." 15 U.S.C. § 1. "It is well established that this provision prohibits only 'unreasonable' restraints of trade." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 74 (3d Cir. 2010). The Sherman Act § 2 states that those who "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of . . . trade or commerce are guilty of a felony." 15 U.S.C. § 2. The Supreme Court has said that there are two elements to § 2: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) (citation omitted) (internal quotation marks omitted). The Clayton Act § 3, which applies to the sale of goods, states that

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . for use, consumption, or resale within the United States . . . , or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

## III. ANALYSIS

### A. Exclusive Dealing

#### 1. Rule of Reason

A claim of unlawful exclusive dealing may be pursued under § 1 or § 2 of the Sherman Act or § 3 of the Clayton Act. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 2016 WL 2600321, at *4 (3d Cir. May 4, 2016); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012);

*LePage's Inc. v. 3M*, 324 F.3d 141, 157 & n.10 (3d Cir. 2003). "An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor*, 696 F.3d at 270. The "agreement" may be express or *de facto. Id.* "[E]xclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods." *Id.* (alteration omitted) (internal quotation marks omitted).

Exclusive dealing agreements are not by themselves unlawful; indeed, firms may enter exclusive dealing agreements for "entirely procompetitive reasons" and exclusive dealing "generally pose[s] little threat to competition." *Id.* "Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason," under which the legality of such an agreement "depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *Id.* at 271. The same rule of reason applies to exclusive dealing claims asserted pursuant to §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act; however, a greater showing of anticompetitive effect is required under Clayton Act § 3 than is required under the Sherman Act. *Id.* at 281, 325.

In short, the exclusion of competitors becomes actionable under antitrust laws only when "it impairs the health of the competitive process itself" and not when it merely disadvantages rivals. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984); *see also ZF Meritor*, 696 F.3d at 281. To survive summary judgment in cases where the rule of reason applies, plaintiff must establish (1) that defendant engaged in anticompetitive conduct and (2) that plaintiff suffered antitrust injury. *See ZF Meritor*, 696 F.3d at 281; *Race Tires Am., Inc.*, 614 F.3d at 74–75.

Certain arrangements that resemble exclusive dealing must also comply with antitrust law. *ZF Meritor*, 696 F.3d at 283. Such "quasi-exclusive dealing" agreements include, among other things, discounts or rebates conditioned on exclusivity, discounts or rebates conditioned on the buyer's purchase of a specified amount or percentage of its needs, and up-front payments from a supplier to a buyer in exchange for access to a retailer's shelf space. *See id.* at 283; *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 906 (N.D. Cal. 2012) *order vacated in part on reconsideration on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012). Quasi-exclusive dealing agreements "are generally lawful because market foreclosure is only partial, and competing sellers are not prevented from selling to the buyer." *ZF Meritor*, 696 F.3d at 283. Still, "[t]he legality of such an arrangement ultimately depends on whether the agreement foreclosed a substantial share of the relevant market such that competition was harmed." *Id.*

Where a plaintiff alleges predatory pricing or where discounted "pricing itself operate[s] as the exclusionary tool" in an exclusive dealing claim, a specific application of the rule of reason called the "price-cost test" may apply. *Id.* at 268–69, 275. Pursuant to the price-cost test, the plaintiff must prove: (1) "that the prices complained of are below an appropriate measure of the defendant's costs; and (2) that the defendant had a dangerous probability of recouping its investment in below-cost prices." *Id.* at 272 (alterations omitted) (citations omitted) (internal quotation marks omitted); *see also Eisai, Inc.*, 2016 WL 2600321, at *8.

The parties dispute whether the price-cost test is applicable here. (*See* D.I. 38 at 36; D.I. 57 at 41; D.I. 93 at 9–11). There is no dispute that TOI's exclusionary arrangements appeared to lower prices for Transitions lenses for many lens casters, labs, and retailers. (*See* D.I. 38 at 36; D.I. 57 at 41). VE does not allege, however, that TOI engaged in below-cost predatory pricing.

(D.I. 57 at 41). Although the conduct VE identifies as exclusionary includes TOI's various loyalty discounts and rebates, it also includes TOI's refusals to deal and other misconduct. (*Id.* at 42). With respect to lens casters, VE alleges that TOI enforced exclusivity by cutting off the supply of Transitions lenses to any lens caster that carried competing products or threatened to enter the photochromic market. (*Id.* at 27). Additionally, VE alleges that TOI enforced exclusivity with lens casters by "discriminatorily den[ying] photochromic and other lens treatment validations to lessen the appeal of TOI's competitors' products." (*Id.*). VE contends that TOI's ECP Store Locator program was also exclusionary because it reduced labs' demand for non-Transitions photochromic products upstream. (*Id.* at 25). With respect to labs and retailers, TOI entered "preferred" contracts pursuant to which the labs and retailers agreed to promote Transitions as their preferred photochromic lens. (D.I. 39-7 at 11, 13). Even in the absence of evidence of "exclusive or nothing" demands (*see* D.I. 93 at 9), price was not the only means of exclusion available to TOI. VE has not alleged that price was TOI's predominant mechanism of exclusion. For the reasons above, the price-cost test does not apply and the appropriate standard is the general rule of reason analysis.

## 2. Anticompetitive Conduct

In analyzing alleged anticompetitive conduct under the rule of reason, "courts consider not only the percentage of the market foreclosed, but also take into account the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *ZF Meritor*, 696 F.3d at 271 (internal quotation marks omitted). A plaintiff must generally show "significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Id.* at 271–72

(citations omitted).  Courts may also consider whether "the dominant firm engaged in coercive behavior, . . . the ability of customers to terminate the agreements," and "[t]he use of exclusive dealing by competitors."  *Id.* at 272 (citations omitted).  "If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition any part of the relevant market."  *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (emphasis omitted); *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196 (3d Cir. 2005) (acknowledging the need to assess the "overall significance to the market" of "other avenues of distribution" in a Sherman Act § 2 exclusive dealing case).  "The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.  *Dentsply Int'l*, 399 F.3d at 191.

TOI argues that its exclusive agreements were not exclusionary under antitrust law because they did not foreclose the relevant market, encouraged competition, did not harm consumers, were not obtained by coercion, and were short in duration or terminable at will.  (D.I. 38 at 34–44).  There are genuine disputes of material fact regarding each of these factors and therefore a triable issue with respect to whether the exclusive arrangements were anticompetitive.

There is a triable issue as to whether TOI's exclusive arrangements substantially foreclosed the market.  TOI argues that its arrangements did not foreclose the market at the lens caster level, pointing to VE's failure to assert that it would have won any lens caster business even if TOI had no agreements with lens casters.  (*Id.* at 38).  Lens casters, however, appear to have rejected VE's offers at least in part because of concerns regarding their arrangements with TOI.  (*See, e.g.*, D.I. 68-44 at 3-4).  More importantly, whether a defendant's exclusive dealing

substantially foreclosed the relevant market is determined not only by reference to whether

plaintiff was foreclosed, but by reference to whether competition as a whole was restricted.

*Dentsply Int'l*, 399 F.3d at 191.  According to VE's expert, TOI's exclusive arrangements

accounted for between about 66% to about 90% of photochromic lens sales at U.S. lens casters

between 2004 and 2009.  (D.I. 55-1 at 143).  A reasonable jury could credit VE's position that

the exclusive arrangements foreclosed a comparable percentage of lens casters from the

photochromic lens market.  Thus, VE has presented competent evidence that TOI's exclusive

arrangements foreclosed the market at the lens caster level.  *See LePage's*, 324 F.3d at 159

(noting that foreclosure of 40% to 50% is usually required to establish an exclusive dealing

violation under Section 1 of the Sherman Act).

At the lab level, TOI argues there was no foreclosure because TOI did not have exclusive

agreements with labs.  (D.I. 38 at 39).  TOI's former CEO explained that the lab agreements

were not exclusive.  (D.I. 39-10 at 13).  According to VE's expert, however, TOI's preferred

contracts with labs foreclosed at least 60% of photochromic lens sales each year between 2006

and 2009.  (D.I. 55-1 at 189).  Agreements pursuant to which a supplier provides discounts or

rebates in exchange for a buyer reaching certain purchase targets can be anticompetitive under

certain circumstances.  *See ZF Meritor*, 696 F.3d at 282–84.  This is true even if the agreements

achieve only partial exclusivity with individual customers and only substantially, but not

completely, foreclose the market.  *See id.* at 283 ("[J]ust as 'total foreclosure' is not required for

an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each

customer.").  TOI's preferred arrangements with labs are therefore subject to scrutiny under the

antitrust laws.

TOI also objects to VE's expert's use of a "tax" theory to opine that TOI's preferred

arrangements with labs resulted in foreclosure. (D.I. 38 at 39 (citing *Church & Dwight*, 868 F.

Supp. 2d at 905–07; *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir.

2000))). TOI argues that, even if the tax theory were proper, it is inapplicable because the

evidence shows that VE could have profitably met TOI's discounts at the lab level but chose not

to. (*Id.* (citing D.I. 39-6 at 149–50, 167–68; D.I. 39-10 at 13–14, 17)). VE's expert's "tax"

theory is relevant to the foreclosure inquiry because it is essentially a specific explanation of how

preferred contracts can increase rivals' costs and thus harm competition. (*See* D.I. 43-1 at 87).

TOI cites no case that mandates rejection of VE's expert's explanation of one way in which

agreements such as TOI's STAR lab contracts can harm competition. (*See* D.I. 38 at 39);

*Concord Boat Corp.*, 207 F.3d at 1056 (rejecting an expert's opinion that the discount programs

at issue imposed a tax on buyers who chose to purchase from other manufacturers because it was

not supported by the evidence in that case); *Church & Dwight*, 868 F. Supp. 2d at 905–07

(noting that the theory that a rebate program can create an anticompetitive "tax" on competitors

by increasing the cost of switching to rivals "has yet to be recognized" by the Ninth Circuit but

assuming that the argument had legal merit). Further, reasonable jurors could conclude that

TOI's conduct unreasonably foreclosed the market at the lab level because TOI did more than

simply offer STAR lab incentives to labs that promoted TOI lenses and maintained TOI lenses as

a certain percentage of their sales. (*See* D.I. 60-21 at 2; D.I. 136-1 at 7–9). VE offers evidence

that TOI also closely monitored the labs with which it had entered preferred agreements and

strictly policed their engagement with other photochromic lens manufacturers. (*See, e.g.*, D.I.

60-23 at 2 (TOI internal e-mail explaining that a lab was "jeopardizing all of [TOI's] support" if

they promoted LifeRx lenses in violation of the STAR lab contract); D.I. 60-25 at 2 (TOI internal

email explaining employee's "concern[]" with putting resources into a lab that made the decision
to stock VE's LifeRx product); D.I. 60-27 at 2 (TOI internal e-mail suggesting that it confront a
lab under a STAR contract that may have been promoting another photochromic product by
asking, among other things, if the lab was "willing to switch out all their Transitions sales to this
new product"); D.I. 61-45 at 2 (TOI internal e-mail explaining close monitoring of a lab that is
stocking another product)).  Thus, even if VE had been able to match TOI's discounts to labs, a
reasonable juror could conclude that TOI's agreements with labs foreclosed the lab channel of
the photochromic lens market.

At the retail level, TOI argues that its contracts did not illegally foreclose the market
because its exclusive contracts with retailers represented only 12% of photochromic lens sales
between 2006 and 2008.  (D.I. 38 at 40; *see* D.I. 39-7 at 20; D.I. 39-9 at 42).  VE's expert opined
that TOI's retail contracts (exclusive and preferred) foreclosed about 34% of the retail channel in
2006 and 2007, and about 92% in 2008 and 2009.  (D.I. 55-2 at 70).  TOI objects to VE's
expert's methodology, arguing that Mr. Baseman calculated an unreasonably high retail
foreclosure rate because he included only the top fifty national retailers and excluded "thousands
of smaller retailers that sell photochromic lenses and with whom TOI does not have exclusive
arrangements."  (D.I. 38 at 40).  Mr. Baseman explained that he excluded smaller retailers and
calculated the foreclosure rate based on larger retailers alone because the larger retailers
"represented the most cost-effective means of distribution for Vision-Ease and for anyone else in
a position—any other entrants in a position to sell directly to retail."  (D.I. 39-10 at 30).  On
closer scrutiny, it does not seem unreasonable for Mr. Baseman to have excluded smaller
retailers because a lens caster like VE cannot easily sell directly to thousands of ECPs the way it
can sell to a smaller number of national retailers.  Internal TOI documentation that suggests that

TOI concentrated efforts on VE's most efficient channels of distribution with retailers supports VE's expert's approach. (*See* D.I. 60-44 at 2; D.I. 60-45 at 2). A jury could reasonably accept or disregard Mr. Baseman's testimony.

TOI argues that its exclusive arrangements encouraged rather than hindered competition. (D.I. 38 at 34). TOI maintains that its exclusive arrangements were procompetitive because they were part of its successful efforts to grow the entire photochromic lens market, which was a new product category. (*Id.* at 35). Statements of TOI's COO supports TOI's argument that its marketing strategy, including the exclusive and preferred arrangements, were designed to benefit the photochromic lens market generally. (D.I. 39-7 at 5 ("TOI's marketing strategy was designed to address the challenge of gaining eye care professionals' acceptance and ultimately the consumer's acceptance of Transitions as an everyday pair of glasses."); D.I. 39-7 at 14 ("[W]orking with retailers to promote our product and educate customers was an effective means of increasing penetration against clear lens sales.")). On the other hand, after VE launched LifeRx and obtained LensCrafters as a customer in 2005, TOI expanded its exclusive arrangement programs to additional retailers to prevent further competition from LifeRx. (D.I. 39-7 at 17–18). Reasonable people could disagree regarding whether the record evidence suggests that the exclusive arrangements were pro- or anti-competitive.

TOI argues that its exclusive and preferred arrangements benefitted consumers because they effectively lowered the price of TOI's Transitions lenses. (D.I. 38 at 36). As an example, TOI points to its marketing agreement with Costco, which contained an "exclusivity condition" that stated that Costco was eligible for a $1 payment per pair and an additional $1 per pair for marketing if Costco did not sell any plastic photochromic lenses other than TOI's Transitions. (D.I. 43-3 at 2). In general, conduct that lowers prices is not considered anticompetitive, as long

17

as prices remain above predatory levels. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337 (1990). There is a dispute in the record, however, regarding whether TOI's agreements lowered prices of photochromic lenses. (*See* D.I. 55-1 at 82–85 (describing increase in cost resulting from foreclosure of efficient distribution channels); *see also* D.I. 48-2 at 259–61 (discussing that loyalty programs like TOI's raise prices); D.I. 54-1 at 8–9 (describing the tax on rivals that results from loyalty contracts)). TOI also argues that its exclusive and preferred contracts were justified business arrangements because they protected TOI's investments and reputation and consequently strengthened TOI's incentives to invest in innovation and marketing. (D.I. 38 at 37). A reasonable jury could conclude, however, that TOI's exclusive arrangements were sufficiently anticompetitive to outweigh TOI's proffered business justification.

The parties dispute whether there was coercion in any of TOI's exclusive agreements, particularly with lens casters, and the parties disagree regarding the legal significance of coercion to an antitrust claim. (*Id.* at 41; D.I. 57 at 43). Coercion is not a required element but can be an important consideration, especially in the § 2 context. *See, e.g., Race Tires Am.*, 614 F.3d at 78 ("In the end, although we do not hold that coercion is an essential element of every successful antitrust claim, we conclude that coercion is a fundamental consideration in the present circumstances . . . ."). While the question of coercion is not determinative, this Court believes that considering it is a useful endeavor in the present factual circumstances.

TOI maintains that it never coerced a lab or retailer to enter into an exclusive agreement, and that the only consequence of failing to sell a certain percentage of Transitions lenses was loss of a "modest negotiated discount." (D.I. 38 at 41). VE, however, cites evidence sufficient to create a genuine dispute of fact regarding whether TOI coerced lens casters. *See ZF Meritor*,

696 F.3d at 278 ("Plaintiffs introduced evidence that compliance with the market penetration

targets was mandatory because failing to meet such targets would jeopardize the [customers']

relationships with the dominant manufacturer of transmissions in the market."), *quoted in Eisai,*

*Inc.*, 2016 WL 2600321, at *7. For example, TOI's president wrote in a letter to TOI's partner,

Rodenstock: "I was disappointed to learn of your decision to launch the Rodenstock Colormatic

line of plastic photochromic lenses in all markets . . . . [I]f Rodenstock takes this action,

Transitions Optical has no alternative but to immediately discontinue its ongoing commercial

partnership with Rodenstock and become a competitor." (D.I. 60-8 at 2). In an internal email,

TOI's president wrote: "Be steadfast in your position. CZV needs us, more than we need them.

Listen politely, but just say no. . . . Let him know, that our intent is to raise their prices in the

next contract. A small amount if they remain exclusive, a large amount if they don't." (D.I. 61-

22 at 2). In an email to TOI's president, a partner's employee wrote: "Finally, I note that you

intend to take an aggressive stance on the purchase of generics and royalties in the event that we

don't sign an agreement in the very near future—I think that's unfortunate and it's a shame that

you didn't mention this when we met; holding a gun to a 'partner's head' is seldom the best way

to create the necessary atmosphere to negotiate this type of agreement." (D.I. 61-23 at 3).

TOI argues that its exclusive arrangements were of short duration or terminable at will

and that they did not all expire at once. (D.I. 38 at 42). The parties agree that all of TOI's

exclusive and preferred arrangements lasted between one and five years. (*Id.* at 42–43; D.I. 57 at

47). TOI contends that some contracts could be terminated for any reason with as little as 30

days' notice. (D.I. 38 at 42–43; *see, e.g.*, D.I. 43-3 at 6). VE maintains that, despite the

theoretical possibility of termination, no retail or lab account ever terminated a TOI agreement.

(D.I. 57 at 47). Without additional information, I cannot determine from the length and language of the contracts whether or not they were actually easily terminable.

On the whole, VE has presented evidence that raises triable issues regarding whether TOI's exclusive and preferred arrangements with lens casters, labs, and retailers foreclosed the photochromic lens market, hindered competition, harmed consumers, and were obtained by coercion. There is therefore a triable dispute of material fact with respect to whether the exclusive arrangements were anticompetitive.

### 3. Antitrust Injury

Antitrust injury consists of two elements: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Race Tires Am.*, 614 F.3d at 76 (internal quotation marks omitted) (internal citations omitted). "To establish [the first element of] antitrust injury, a plaintiff must show harm to competition, not just harm to the plaintiff competitor." *Id.* at 83. To establish the second element of antitrust injury, plaintiff must prove the defendant's violation was "a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 788–89 (6th Cir. 2002). A plaintiff that had an opportunity to compete for exclusive contracts did not suffer an antitrust injury by failing to obtain them. *Race Tires Am.*, 614 F.3d at 84.

### a. *Harm of the type the antitrust laws were intended to prevent*

TOI argues that VE's exclusive dealing claims must fail because there is no genuine dispute as to whether TOI's conduct harmed competition in the photochromic lens market at three levels of the supply chain: lens casters, labs, and retailers. (D.I. 38 at 21). For the reasons

discussed below, I conclude that there is a genuine issue of material fact regarding whether TOI's conduct harmed competition in the photochromic lens market.

VE has presented evidence that TOI's conduct harmed competition at the lens caster level. TOI argues that VE has identified no lost sales or other damages resulting from TOI's exclusive partnership arrangements with some lens casters. (*Id.* at 22; *see also* D.I. 39-10 at 3–4, 10). TOI maintains that the fact that VE never sold photochromic lenses to lens casters, even after TOI agreed to cease its exclusive arrangements with lens casters, undermines its argument that it was harmed by TOI's exclusive arrangements with lens casters. (D.I. 38 at 22). TOI also points to deposition testimony by VE's CFO, who stated, "to manufacture lenses on behalf of another lens manufacturer who has a unique design is—was a hurdle that one would have to get over and maybe wouldn't be the most efficient way to get placement of our photochromic technology in the market." (D.I. 39-6 at 7–8).

The record demonstrates, however, that VE attempted and failed to make licensing and other arrangements with lens casters to monetize its LifeRx technology. (*See, e.g.*, D.I. 58 at 5–6 (VE's CEO explaining that from 2006 to 2008, VE tried and failed to license LifeRx technology to lens casters); D.I. 60-56 at 10–13 (VE employee explaining that VE attempted and failed to license LifeRx to lens casters Zeiss-SOLA, Seiko, Shamir, and Thai Optical)). There is evidence that lens casters such as Zeiss-SOLA rejected VE's offers to license LifeRx at least in part because of concerns about TOI's response. (*See, e.g.*, D.I. 68-44 at 3–4 (Zeiss representative explaining, "Look, I have heard the word 'monopoly' used with Transitions, certainly within the period of time that you're speaking of, which is a fairly broad period. From 2005 through spring of 2010, it's my understanding that Carl Zeiss Vision Inc. were required to—within the plastic photochromic area, we had an exclusive arrangement that actually prevented us from having

other plastic photochromic products in our portfolio at that time.")).  VE's expert opined that one

reason a lens caster might not want to license technology from VE is that "they may fear that if

they take the technology, it's going to jeopardize their relationship with TOI."  (D.I. 39-10 at 23–

24).  VE has presented evidence that TOI's conduct harmed competition at the lens caster level.

VE has also presented evidence that TOI's arrangements harmed competition among

labs.  TOI maintains that it did not have exclusive agreements or *de facto* exclusive agreements

with any labs.  (D.I. 38 at 23; *see also* D.I. 39-7 at 8).  TOI did, however, offer financial

incentives to certain labs to promote TOI's lenses.  (D.I. 39-7 at 10 ("In addition to promotional

support and resources, TOI offered labs a modest amount of co-operative advertising funds ('co-

op'), sometimes also called Business Building Funds, or BBFs.  These co-op funds were

typically accrued at much less than a dollar per pair of Transitions lenses sold by the lab.")).

TOI's financial incentives with labs were tiered so that a "lab could accrue more co-op funds if it

sold more Transitions lenses or achieved a higher percentage share of Transitions sales against

all ophthalmic lenses."  (*Id.* at 10–11).  TOI characterizes these incentives as modest and

contends that VE "could easily have met or exceeded these levels of incentive."  (D.I. 38 at 24

(citing D.I. 39-6 at 28–30; D.I. 39-10 at 17)).  VE cites an email from TOI to show that TOI

hindered competition for lab business by retaliating against VE, specifically targeting VE's lab

customers.  (D.I. 57 at 24–25; D.I. 68-42 at 2 ("Here is a list of VE Select labs that have been

presented the new product, and which will most likely be carrying it.  I think it makes sense that

we also contact these labs quite aggressively . . . .")).  Although TOI did not enter exclusive

arrangements with labs, there is some evidence from which a reasonable jury could conclude that

its preferred arrangements and pressure not to do business with other lens casters harmed

competition at the lab level. *See Dentsply Int'l*, 399 F.3d at 189–90.

Additionally, VE has presented evidence that TOI's conduct harmed competition at the retail level. TOI argues that it had exclusive agreements with a small number of retailers accounting for only 12% of sales of photochromic lenses between 2006 and 2008. (D.I. 38 at 25; *see also* D.I. 39-9 at 42). This figure, however, is disputed. VE argues instead that TOI's retail contracts covered about 34% of the retail channel in 2006 and 2007, and about 92% in 2008 and 2009. (D.I. 57 at 31; *see also* D.I. 55-2 at 70). VE's figure must be credited at this stage because evidence must be viewed in the light most favorable to VE. TOI argues that VE could have easily matched or beaten these efforts to obtain exclusive sales, relying in part on testimony from VE's CEO and CFO. (D.I. 38 at 26; *see also* D.I. 39-6 at 29 ("[T]he reason of my pause is because you're asking would we have money to do exclusivity. We don't do exclusivity so it wouldn't matter how much money we had; we wouldn't enter into such an arrangement."); D.I. 39-6 at 153 ("Q. And if exclusivity cost Transitions $5 million, did you have the financial wherewithal to match that $5 million? . . . A. Without knowing the volume of sales, I can't make an absolute answer on that. But, yes, I believe we would have.")). Although the evidence that TOI cites suggests that VE may have been financially able to pay some amount for retailer exclusivity, it does not settle as a matter of law whether VE could have realistically resisted TOI's alleged exclusion of VE from the retail channel. VE points to TOI internal documentation showing that TOI concentrated its efforts on VE's most important retail relationships. (D.I. 57 at 32; *see also* D.I. 60-44 at 2 ("Rose requested a list of who uses VE currently. We need to know who the key retailers are who use VE now so that we can protect our interests. This will be a real test of the partnerships that we have built.")). VE also points to statements from TOI to its board that imply harm to VE's dealings with retailers. (D.I. 57 at 32–33; *see also* D.I. 69-38 at 2 (According to notes of a meeting of TOI's board, "[One director] had been very concerned by

Vision-Ease's ('VE') incursion in the market which involved VE targeting many retailers including Lenscrafters. [The director] reported that the company was successful in maintaining its business everywhere except Lenscrafters.")). Further, evidence from a draft TOI internal business strategy document suggests that the exclusive contracts with retailers harmed VE. (*See* D.I. 69-40 at 13–14 ("The competitive threat from LifeRx has been mitigated by signing the majority of large retail chains to exclusive agreements to distribute Transitions® lenses. In response to Transitions sales initiatives, Vision-Ease has countered in the market with lower pricing. The low-price strategy being implemented by Vision-Ease is being closely monitored.")). VE maintains that TOI targeted the most efficient channels of distribution, foreclosing, on average, 79% of VE's best available opportunities in the retail channel between 2006 and 2009. (D.I. 57 at 32; *see also* D.I. 55-1 at 188). Thus, VE has presented evidence that TOI's conduct harmed competition at the retail level.

    VE has presented evidence that, in sum, raises a genuine issue of material fact with respect to whether TOI's conduct harmed competition in the photochromic lens market.

    b. *Injury to the plaintiff which flows from that which makes defendant's acts unlawful*

    TOI argues that it is entitled to summary judgment on the basis of VE's antitrust injury for two reasons: First, TOI argues that VE cannot establish antitrust injury because VE requests damages not attributed to TOI's anticompetitive conduct. (D.I. 38 at 33). Second, TOI argues that TOI was not the cause of the injuries VE alleges.

    First, TOI argues that VE's claims fail because VE requests damages not attributed to TOI's anticompetitive conduct. (*Id.*). The Supreme Court has explained that an "injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Atl.*

24

*Richfield Co.*, 495 U.S. at 334. TOI's theory is as follows. Because VE's expert claims damages on the lost profits it would have earned had it been able to share in TOI's monopoly profits, TOI believes this means that VE conceded that TOI's behavior was not anticompetitive. (D.I. 38 at 34 ("VE advances a theory that simply makes no sense—either TOI's prices are competitive, in which case there is no antitrust violation, or TOI's prices are anticompetitive, in which case VE's efforts to share in those prices cannot be antitrust injury.")). VE, however, responds that its damages theory assumes that any price reductions associated with removing TOI's exclusionary conduct would be offset by price increases realized by eliminating TOI's "taxes" on competition. (D.I. 57 at 45). While this assumption could be challenged, it does not concede a lack of antitrust injury.

Second, TOI argues that VE's conduct, poor sale strategies, and defective products, not TOI's conduct, caused VE's injuries. (D.I. 38 at 24, 28). "An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage." *Conwood Co.*, 290 F.3d at 788–89.

It appears beyond dispute that VE's products suffered from problems associated with delamination. (D.I. 38 at 28–30; D.I. 57 at 44–45). The severity of the delamination issue and the extent to which it caused VE to lose sales to retailers are disputed. Senior executives at VE identified delamination as a cause of declining sales. (*See, e.g.*, D.I. 41-10 at 141 (In an email response to a question about the loss of business at LensCrafters, VE's CFO explained, "The FTC ruling is not relevant to our loss to Transitions at [LensCrafters. I]t is [the] delam[ination] issues and consignment of Transitions product by casters.")). LensCrafters explained in internal documentation that "LC stores have lost faith in the integrity of this product, especially with

'green' delams now increasing!" (D.I. 41-6 at 57). It was "the largest customer issue the brand

has ever experienced!" (*Id.*). Sales to Walmart also ceased, probably because of the

delamination issue, though the record is not entirely clear on this point. (*Id.* at 68 (as a VE Rule

30(b)(6) witness explained, "I never heard directly from Walmart what the reason was. From

internal employees there was concern at the dispensary level with a quality issue associated with

the LifeRX product."); *see also* D.I. 41-5 at 52 (In Walmart meeting notes, the company did "not

want to do anything that may increase use of LifeRx before [there was] confidence that the

delamination problem has been resolved.")). According to Michael Ness, a former VP of

marketing and sales for VE, the problem of delamination was significant. (D.I. 39-8 at 66–67

("Q. Would it be fair to say that the delamination problem with LifeRx eventually over the years

was much bigger than first anticipated when you first saw the issue in mid-2006? A. Yeah. I

think—I think when—when you first look at the issue and you try to quantify it, you would like

to think that it's not going to be as large as it eventually became. But yes, it did become

significant.")). Delamination "softened" sales at LensCrafters and Walmart, two of VE's biggest

customers. (*Id.* at 67 ("Vision-Ease's sales perhaps might have been softened a bit in the two

largest customers who were selling it at the time, which, of course, were LensCrafters and

Walmart. Softened simply because the dispensers may not have been as aggressive in offering it

if they had experienced delamination.")).

Delamination appears to have been a significant issue, but it was not the only one.[5] (D.I.

41-4 at 46 (As a VE Rule 30(b)(6) witness explained in a deposition, "we lost the business with

---

[5] VE's expert, Mr. Kenneth Baseman, also suggests that VE may have been able to avoid the delamination issue if it had not been for TOI's exclusionary conduct because VE would have been able to test LifeRx lenses in a small number of stores. (D.I. 43-1 at 111–13). Mr. Baseman maintains that VE was unable to test for delamination because LensCrafters and VE feared that TOI would retaliate if it learned of LifeRx. (*Id.*). I am not persuaded that VE would have avoided the delamination issue if it were not for TOI because the record shows that LifeRx passed all of VE's delamination tests prior to launch (D.I. 41-5 at 58–59) and no contemporaneous documents state that VE would have conducted further testing (*See* D.I. 43-1 at 111–12; D.I. 58 at 13).

LensCrafters before they had any delaminations with that product. And so I believe that, while there may have been some impact of delamination in their decision, I believe there were significant other factors involved in their decision.")). Mr. Ness maintained that sales of LifeRx were growing during the time that VE's retail buyers began to notice problems with delamination. (D.I. 39-8 at 67 ("On the other hand, during that time frame, we continued to roll out the product to other Luxottica store brands. So we were actually growing our sales."). That VE's sales with LensCrafters had not recovered two years after the FTC consent decree was probably not attributable solely to delamination. (D.I. 41-4 at 50 (VE's Rule 30(b)(6) witness was questioned in a deposition: "Q. It's been two years plus since that consent order, right? . . . A. The cost of changing out products in a thousand stores and a warehouse and four laboratories is significant, and LensCrafter[s] does not change product easily. So once we lost that business to Transitions, just taking away an anticompetitive behavior is not enough reason for them to give it back to us because there's still going to be significant cost on switching.")).

TOI also points to management decisions that led to a loss of sales. TOI argues, for example, that VE's private equity owners prioritized returns over investment, and that VE did not invest in brand awareness. (D.I. 38 at 31). It is difficult to determine, absent additional facts, whether or not these business decisions actually led to a loss of sales. While TOI may be able to establish at trial that TOI's conduct was not a substantial factor causing VE's injuries, VE has presented sufficient evidence based on which a reasonable juror could conclude that TOI caused VE's loss of sales, notwithstanding that delamination also contributed. The record thus demonstrates that there is a triable issue of fact as to whether TOI's exclusionary conduct was a substantial factor causing VE's loss of sales.

For the reasons above, TOI's motion for summary judgment regarding exclusive dealing is denied.

## B. Refusal to Deal

TOI argues, first, that VE's refusal to deal claim is barred by the statute of limitations. (D.I. 38 at 47). TOI argues, second, that there is no evidence that TOI ceased participation in its business relationship with VE and that VE's refusal to deal claim must therefore fail. (*Id.* at 45–46).

TOI argues that VE's refusal to deal claim is barred by the four-year statute of limitations because the complaint was filed in July 2010 and the relevant events occurred prior to July 2006. (*Id.* at 47); *see also* 15 U.S.C. § 15(b). TOI essentially argues that the refusal to deal claim was either a single event in 2005 and therefore barred by the statute of limitations; or if the events were continuous, they cannot be a refusal to deal because VE did not make new efforts to deal with TOI after July 2006 (notwithstanding the FTC-imposed 2009 agreement). (D.I. 38 at 47). Courts generally do not toll the statute of limitations on a continuing violation theory when the Plaintiff knew of the initial violation and suffered sufficient injury. *See Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 272 (8th Cir. 2004).

VE's refusal to deal claim is not barred by the statute of limitations because VE alleges that TOI's refusal to deal continued after July 2006, including around the time of the 2009 agreement. Additionally, TOI's alleged refusal to deal is part of a continuing series of exclusionary acts that, according to VE, constitutes TOI's effort to monopolize the photochromic lens market. *See, e.g., Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968); *see also Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975) ("[C]ontinuing antitrust conduct resulting in a continued invasion of a plaintiff's rights may give

28

rise to continually accruing rights of action. It remains clear nonetheless that a newly accruing

claim for damages must be based on some injurious act actually occurring during the limitations

period, not merely the abatable but unabated inertial consequences of some pre-limitations

action.")).

Generally, a firm has no obligation to cooperate with rivals. *See Broadcom Corp. v.

Qualcomm Inc.*, 501 F.3d 297, 316 (3d Cir. 2007). The Supreme Court has said that "the high

value that we have placed on the right to refuse to deal with other firms does not mean that the

right is unqualified." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S.

398, 408 (2004) (alteration omitted) (internal quotation marks omitted). Still, the Supreme Court

has been "very cautious" in recognizing "exceptions" that limit the right to refuse to deal with

other firms. *Id.* According to the Supreme Court, the "leading" case on refusals to deal, which is

"at or near the outer boundary of § 2 liability," recognized that terminating a voluntary and

profitable course of dealing, forsaking short-term profits to achieve an anticompetitive end, was

unlawful. *Id.* at 409 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585,

601 (1985)).

The present matter differs significantly from the narrow refusal to deal exception

identified by *Aspen Skiing*. *See Aspen Skiing Co.*, 472 U.S. at 593–94; *see also Verizon*, 540

U.S. at 408–09. In November 1992, the parties entered into a supply agreement that

automatically renewed for successive one-year terms every September 30, unless one party gave

the other ninety days' notice of its intention to terminate. (D.I. 41-4 at 30). On June 13, 2005,

TOI timely notified VE of its intention to terminate the agreement effective September 30, 2005.

(*Id.* at 33). TOI's termination notice from TOI's president expressly states that TOI was willing

to deal with VE in the future. (*Id.* ("As we discussed, this notification is a formality and we

sincerely hope that a new agreement reflecting an enhanced business relationship will be in place before the expiration date.")). TOI maintains that it desired to continue the relationship but that VE never responded to TOI's overtures. (D.I. 38 at 46). VE maintains, on the other hand, that TOI "first tried and threatened to terminate VE, and then actually did so." (D.I. 57 at 47–48).

That TOI terminated the supply agreement in 2005 was not, in itself, a refusal to deal. VE does not offer evidence that it tried to continue the relationship with TOI after June 2005 and was rebuffed. Instead, VE offers the opinion of its CEO regarding TOI's motivation for terminating the supply agreement. (*See* D.I. 58 at 14, ¶ 36).[6] According to VE's CEO, TOI terminated the contract for anticompetitive ends several weeks before VE shipped its product to LensCrafters and Walmart. (*See id.* ("I . . . knew—based upon all the circumstances—that the termination would become irrevocable when VE actually shipped LifeRx to LensCrafters and Wal-Mart in July.")). VE also offers evidence that TOI disrupted VE's supply of Transitions lenses. (*See* D.I. 59-1 at 2 (TOI email in which TOI employee jokes about disrupting VE's supply); D.I. 59-2 at 2–4 (charts showing TOI order fill rates dipping in June 2005 (plastic Transitions lenses) and in July 2005 (polycarbonate Transitions lenses)). VE's opinions regarding TOI's motivation in terminating the contract and the reasons behind certain dips in TOI's order fill rates are insufficient to raise a triable issue of material fact with respect to whether TOI refused to deal after terminating the supply agreement in 2005. *See Out Front Prods., Inc. v. Magid*, 748 F.2d 166, 172 (3d Cir. 1984) (affirming summary judgment where plaintiff had a "pessimistic belief" that it would not win business).

Further, VE maintains that TOI made no effort to regain VE's business until 2009. (D.I. 58 at 20–21, ¶¶ 55–56). TOI disagrees, stating that TOI approached VE in 2008 about a new

---

[6] I assume, without deciding, that D.I. 58 at 14, ¶ 36 is admissible.

business relationship. (D.I. 93 at 7 (citing D.I. 96-1 at 77–79)). Even after the parties entered a supply agreement in 2009, according to VE's CEO, certain discussions about additional opportunities "broke down" and TOI "dragged its feet." (D.I. 58 at 21, ¶ 58). Good faith business negotiations often contain a back-and-forth but are not anticompetitive. Without more, the evidence does not demonstrate that TOI unlawfully refused to deal with VE.

VE has failed to raise a triable issue of fact regarding whether TOI's termination of the parties' supply agreement in 2005 and subsequent conduct amounted to a refusal to deal. TOI is therefore entitled to summary judgment on VE's refusal to deal claim.

## C. State Law Claims

TOI argues that VE's state law claims should fail. (D.I. 38 at 48–50). VE voluntarily dismisses three state law claims: Alabama, Illinois, and Ohio. (D.I. 57 at 50). With the exception of the three state law claims VE has dropped and VE's claim under Louisiana's consumer protection law, TOI's cursory description of the material parts of VE's state law claims suggests that they rise and fall with federal antitrust law. Louisiana law, according to TOI, requires establishing conduct that is unconscionable or deceptive. At this time, based on the record cited above, there appears to be a genuine dispute of fact on that issue.

For the reasons above, TOI's motion for summary judgment regarding the remaining state law claims is denied.

## D. Motions to Exclude

TOI moves to exclude evidence proffered by VE in its opposition to TOI's motion for summary judgment. (D.I. 99). TOI urges the Court to disregard numerous documents, declarations, and exhibits in deciding the summary judgment motion. (*Id.* at 11).

TOI seeks to exclude certain evidence of the FTC consent order on the grounds that it is inadmissible under 15 U.S.C. § 16(a) and Federal Rules of Evidence 408, 401, 403, 802, and 703. (*Id.* at 11–15). I have not relied on any of the FTC settlement evidence to which TOI objects, with the apparent exception of D.I. 58 at 5–6, ¶¶ 11–12 and D.I. 58 at 20–21, ¶ 56. *See supra* pp. 21, 30; (D.I. 99 at 11). Paragraphs 11 and 12 of Mr. Hepper's declaration do not refer to the FTC consent order and are thus not excludable on the grounds that they improperly refer to the FTC consent order. (*See* D.I. 58 at 5–6). Although Paragraph 56 of Mr. Hepper's declaration mentions the FTC, I have relied on it only as evidence that between when TOI terminated the supply agreement with VE in 2005 and December 1, 2009, TOI did not seek to deal with VE. *See supra* p. 30. Because whether references to the FTC were excluded would have no effect on the summary judgment analysis, TOI's motion is dismissed as moot insofar as it seeks to exclude the references to the FTC consent order.

TOI also seeks to exclude the declarations of Barry Resnik, VE's Director of Marketing (D.I. 59), and Douglas Hepper, VE's President and CEO (D.I. 58), pursuant to Federal Rule of Civil Procedure 56(c)(4). (D.I. 99 at 15). Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." TOI argues that the declarations are not limited to facts within the personal knowledge of each declarant because they are "based upon [the declarants'] personal knowledge, . . . review of VE's business records, and . . . discussions with VE's employees." (D.I. 58 at 1; D.I. 59 at 1). "[T]here is no explicit requirement that a declaration state that it is based on personal knowledge." *In re NWL Holdings, Inc.*, 2013 WL 2436667, at *4 (Bankr. D. Del. June 4, 2013); *see DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005). As long as

the declaration states facts within the declarant's "sphere of responsibility," a court may infer

that the declarant has the requisite personal knowledge and is competent to testify. *See In re*

*NWL Holdings, Inc.*, 2013 WL 2436667, at *4; *DIRECTV, Inc.*, 420 F.3d at 530; *Diamond*

*Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 544 n.13 (5th Cir. 2002), *overruled on other*

*grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).

As VE's Director of Marketing since 2002, Mr. Resnik is undoubtedly competent to

testify from personal knowledge regarding VE's products and those of TOI, VE's former

supplier and customer. (*See* D.I. 59 at 1); *supra* pp. 3 & n.1, 4. As VE's President and CEO

since 2002, Mr. Hepper's "sphere of responsibility" includes VE's attempts to license its LifeRx

technology to lens casters and its negotiations with TOI. (*See* D.I. 58 at 1); *supra* pp. 21, 30.

The declarations of Mr. Resnik and Mr. Hepper are therefore not excluded in their entireties

pursuant to Rule 56(c)(4).[7]

TOI also seeks to exclude D.I. 68-44 at 3–4, deposition testimony from a Rule 30(b)(6)

designee of Carl Zeiss Vision Inc. ("CZVI") on the grounds that it is inadmissible hearsay, lacks

foundation, and is irrelevant. (D.I. 99 at 25; D.I. 115 at 16 & n.5). CZVI is a U.S. subsidiary of

Carl Zeiss Vision International GmbH ("CZVIG"), a German company. (D.I. 99 at 25). TOI

maintains that because CZVIG, not CZVI, would have conducted any negotiations with VE, the

proffered CZVI testimony does not reflect personal knowledge about why CZVIG did not pursue

---

[7] TOI also seeks to exclude certain statements in the declarations of Mr. Hepper and Mr. Resnik on evidentiary grounds. (D.I. 99 at 16). Although I have not considered, in deciding the motion for summary judgment, the specific statements that TOI contends should be excluded, I recognize that there is no reason to presume that Mr. Hepper could testify from personal knowledge about TOI's intentions and motivations. (*See* D.I. 99 at 21). Assuming they were admissible, I concluded that Mr. Hepper's interpretations of TOI's conduct were insufficient evidence to prevent summary judgment in favor of TOI on VE's refusal to deal claim. (*See supra* Part III.B). Consequently, I decline to decide TOI's motion to exclude the specific statements in D.I. 58 and D.I. 59 on which I did not rely. (*See* D.I. 99 at 21); *Masci v. Six Flags Theme Park, Inc.*, 2014 WL 7409952, at *4 n.3 (D.N.J. Dec. 31, 2014).

VE's LifeRx product.  (*Id.*).  The challenged testimony, however, states reasons that CZVI

would not have offered VE's LifeRx technology.  (*See* D.I. 68-44 at 3–4 ("When it comes to

local deployment of [TOI] co-op marketing funds made available to Carl Zeiss Vision Inc., yes, I

did have those conversations with my senior management. . . . [I]t's my understanding that . . .

we had an exclusive arrangement that actually prevented us from having other plastic

photochromic products in our portfolio at that time.")).  The CZVI Rule 30(b)(6) witness

therefore testified to information known to CZVI.  The testimony is not hearsay and it is relevant

to VE's exclusive dealing claim.  TOI's motion to exclude is therefore denied with respect to

D.I. 68-44 at 3–4.

   TOI's motion to exclude is dismissed as moot with respect to all other evidence to which

TOI specifically objects (D.I. 99 at 11) because the Court did not consider it in deciding the

motion for summary judgment.  *See Masci*, 2014 WL 7409952, at *4 n.3.

   For the reasons stated above, TOI's motion to exclude inadmissible summary judgment

evidence is denied in part and dismissed in part as moot.  Consequently, VE's conditional cross

motion to exclude (D.I. 111) is dismissed as moot.  (*See* D.I. 112 at 4–5).

## IV.  CONCLUSION

   For the foregoing reasons, Defendant's Motion for Summary Judgment (D.I. 38) is

**GRANTED IN PART** and **DENIED IN PART**; Defendant's Motion to Exclude (D.I. 98) is

**DENIED IN PART** and **DISMISSED IN PART**; and Plaintiff's Conditional Cross-Motion to

Exclude (D.I. 111) is **DISMISSED**.  An appropriate Order will follow.