# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INSIGHT EQUITY d/b/a VISION-EASE LENS
WORLDWIDE

        Plaintiff,

        v.

TRANSITIONS OPTICAL, INC.,

        Defendant.

No. 10-cv-635 (RGA)

## MEMORANDUM OPINION

Alessandra Glorioso, Esq., Robert W. Mallard, Esq., Dorsey & Whitney LLP,
Wilmington, Del.; Michael A. Lindsay, Esq., George G. Eck, Esq., F. Matthew
Ralph, Esq. (argued), Andrew Brantingham, Esq., Dorsey & Whitney LLP,
Minneapolis, Minn.; H. Alex Iliff, Dorsey & Whitney LLP, New York, N.Y.,
attorneys for Plaintiff.

Chad M. Shandler, Esq., Katharine C. Lester Mowery, Esq., Richard, Layton, &
Finger, P.A., Wilmington, Del.; Jonathan M. Jacobson, Esq. (argued), Chul Pak,
Esq., Jeffrey C. Bank, Esq., Daniel Weick, Esq., Wilson, Sonsini Goodrich & Rosati
Professional Corp., New York, N.Y.; Lisa A. Davis, Esq., Wilson, Sonsini Goodrich &
Rosati Professional Corp., Palo Alto, Cal., attorneys for Defendant.

May 9, 2017

*Richard G. Andrews*
**ANDREWS, U.S. DISTRICT JUDGE:**

Plaintiff Vision-Ease has sued its competitor, Defendant Transitions Optical, under federal antitrust law.[1] Both Vision-Ease and Transitions Optical are in the business of selling photochromic lenses. Photochromic lenses change from clear to tinted and back again depending on the wearer's environment.

To prove Defendant has violated antitrust law by holding monopoly power and engaging in anti-competitive behavior, Plaintiff has proffered the expert testimony of Kenneth Baseman. To prove the opposite, Defendant has proffered the testimony of Dr. Lauren Stiroh. Plaintiff also relies on Donald Nicholson to calculate damages.

Both parties have moved to strike portions of the other's experts' testimony. (D.I. 46; D.I. 40). On November 3–4, 2016, I held a *Daubert* hearing on these motions and took testimony from Mr. Baseman and Dr. Stiroh. (D.I. 157; D.I. 158).

## I.  LEGAL STANDARD

"[T]he district court acts as a gatekeeper" to ensure that expert testimony is reliable and helpful. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "The

---

[1] For a more complete recounting of the litigation, see my previous summary judgment opinion. D.I. 141; *Insight Equity d/b/a Vision-Ease Lens Worldwide v. Transitional Optical, Inc.*, 2016 WL 3610155 (D. Del. Jul. 1, 2016).

2

primary locus of this obligation is [Federal Rule of Evidence] 702...." *Daubert v.*

*Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993). It reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702, as amended in 2000, codified the Supreme Court's holding in

*Daubert. Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 320 (3d Cir. 2003). The

*Daubert* Court rejected the then widely used *Frye* test. *See Daubert*, 509 U.S. at 589.

The *Frye* test required an expert's theory or process be "generally accepted as

reliable in the relevant scientific community." *Id.* at 584 (internal quotation marks

omitted). The test was seen as imposing too "rigid" a requirement. *See id.* at 588.

This rigidity was "at odds with the liberal thrust of the Federal Rules and their

general approach of relaxing traditional barriers to opinion testimony." *Id.* at 588

(internal quotation marks omitted).

## A. Burden of Proof

*Daubert* replaced the *Frye* test with a "trilogy" of requirements: (1)

qualification, (2) reliability, and (3) fit. *Schneider*, 320 F.3d at 404. My

determination that proffered testimony complies with these prerequisites is

3

governed by Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592. As such, I must find *Daubert*'s trilogy of requirements is met by a preponderance of the evidence. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

On the one hand, this showing requires the party proffering expert testimony do more than make a *prima facie* case of reliability. *Id.* at 743. On the other hand, the "evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* The proffering party does not "have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* at 744.

## B. Qualification

The first prerequisite, qualification, "refers to the requirement that the witness possess specialized expertise." *Schneider*, 320 F.3d at 404. While the language of *Daubert* is couched in terms of scientific expertise and knowledge, the qualification requirement as well as the fit and reliability requirements are imposed on other technical or specialized knowledge. *Calhoun*, 350 F.3d at 321 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).

The Third Circuit has interpreted the qualification requirement "liberally" and has "eschewed imposing overly rigorous requirements of expertise...." *Paoli*, 35 F.3d at 741. Generalized qualifications are sufficient, *id.*, but "more specific knowledge is required to support more specific opinions," *Calhoun*, 350 F.3d at 322.

4

In this case, the experts' qualifications are not, nor could they reasonably be, contested.

## C. Reliability

"[A]n expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Paoli*, 35 F.3d at 742. Reliability does not require certainty. *Daubert*, 509 U.S. at 590, but does require "validity," *Paoli*, 35 F.3d at 742.

As with all of the *Daubert* requirements, I have a gatekeeping role to play in assessing the reliability of the expert testimony. "When there is a serious question of reliability of evidence, it is appropriate for the court to exercise to some degree an evidentiary screening function." *Paoli*, 35 F.3d at 743 (quoting *United States v. Downing*, 753 F.2d 1224, 1240 n. 21 (3d Cir. 1985)).

That being said, the Third Circuit has warned that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Id.* at 744. An expert's opinion must be founded on good grounds, not perfect ones. *Id.* I can conclude there are good grounds for the opinion even if I "think[]there are better grounds for some alternative conclusion" or that the expert's methodology "has some flaws such that if they had been corrected, the scientist would have reached a different result." *Id.* The Third Circuit has directed that a "judge frequently should find an expert's methodology helpful even when the

5

judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *Id.* at 744–45.

## D. Fit

Fit is the gravamen of the *Daubert* challenges at issue in this case. The same liberalness in evaluating reliability applies in evaluating fit. *Id.* at 745. "Once again, [the Third Circuit] emphasize[s] that the standard is not that high." *Id.* Fit speaks to "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Id.* at 743 (quoting *Downing*, 753 F.2d at 1237).

Put in the terms of Rule 702, fit asks whether the proffered testimony is sufficiently helpful. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation omitted)). "[H]elpfulness requires more than bare logical relevance, but there is a strong preference for admission." *Paoli*, 35 F.3d at 745.

A significant concern in evaluating fit is whether there is mismatch between the expert's technique and the issues in the case. "[V]alidity for one purpose is not necessarily [] validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591. "Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*." *Paoli*, 35 F.3d at 743.

6

The Supreme Court explained this mismatch concern with a hypothetical. A party seeking to introduce expert testimony on the phases of the moon may appropriately do so to explain "whether a certain night was dark." *Daubert*, 509 U.S. at 591. That same testimony is not admissible to explain "whether an individual was unusually likely to have behaved irrationally on that night." *Id.*; *see also Paoli*, 35 F.3d at 743 ("For example, animal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans.").

### E.    Rule 403

Assuming an expert meets the requirements of qualification, reliability, and fit, there is still "some room for Rule 403 to operate independently." *Paoli*, 35 F.3d at 746. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

On the one hand, the Supreme Court has explained, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge ... exercises more control over experts than over lay witnesses" under Rule 403. *Daubert*, 509 U.S. at 595 (citations omitted). On the other, the Third Circuit has warned: "[A] district court cannot exclude a scientific

7

technique as too confusing and overwhelming simply based on its conclusion that scientific techniques by their very nature confuse and overwhelm the jury." *Paoli*, 35 F.3d at 746. Instead, in order to exclude expert evidence under Rule 403, there "must be something about the particular [] technique such as its posture of mythic infallibility that makes is especially overwhelming." *Id.*

## II.  PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S MARKET DEFINITION

Defendant proffers the expert testimony of Dr. Lauren Stiroh. Dr. Stiroh is an economics expert holding three degrees in the subject—a bachelor's, master's, and doctorate. She is a Managing Director at NERA Economic Consulting. (Stiroh Report[2] at 5; D.I. 158 at 4–5). At NERA, she serves as chair of the Antitrust and Competition Policy practice. While she is offering a range of opinions, Plaintiff's challenge focuses on the quantitative analyses supporting her market definition. (*See* D.I. 40). Plaintiff brings these challenges under both Rule 702 and Rule 403.

### A.  The Proffered Testimony and the *Cellophane* Fallacy

Defining the relevant market is an important initial inquiry in an antitrust case. *See, e.g.*, 2b Areeda & Hovenkamp, *Antitrust Law*, ¶¶ 500, 531a, 531e (4th ed. 2014). Generally speaking, the relevant market includes the accused monopolist's

_____

[2] Dr. Stiroh's intial report can be found at D.I. 45-1.

products and close substitutes. *E.g.*, Hovenkamp, *Federal Antitrust Policy* § 3.3b1 (5th ed. 1994); *see also* 2b Areeda & Hovenkamp, *supra*, ¶¶ 536, 537a. Close substitutes are products that constrain the ability of the accused monopolist to control prices. 2b Areeda & Hovenkamp, *supra*, ¶ 506.

Dr. Stiroh defines the market in this case to include both photochromic and clear lenses. (Stiroh Report at ¶ 51). To support her market definition, Dr. Stiroh uses two econometric tests: cross-price elasticity of demand and co-price movement. (*See* Stiroh Report at ¶¶ 48–49).

### i. *Cross-Price Elasticity of Demand*

Cross-price elasticity of demand measures whether two products are substitutes by defining the relationship between the price of one product and the demand for another product. Hovenkamp, *supra*, § 3.4a; William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 945 (1981). Specifically, "[t]he cross-price elasticity of demand measures the percent change in the quantity of photochromic lenses purchased in response to a one-percent change in the price of non-photochromic lenses." (Stiroh Report at ¶ 49); *see* Areeda & Hovenkamp, *supra*, ¶ 507a. A strong relationship between the price of one product and demand for the other shows that consumers of the two products view them as substitutes. *Id.*

Dr. Stiroh performed a cross-price elasticity of demand analysis and found that clear and photochromic lenses are substitutes. (Stiroh Report at ¶¶ 60–72).

9

## ii. Co-Price Movement

Co-price movement takes a different approach to defining the relevant market. This analysis looks at whether the prices of two products move together. Richard Posner, *Antitrust Law* 149 (2d ed. 2001). A positive relationship indicates that two products are subject to the same market forces and thus are in the same market. *Id.* at 149–50.

Dr. Stiroh performed a co-price movement analysis and found a statistically significant relationship between clear and photochromic lenses. (Stiroh Report at ¶¶ 52–59). To confirm this relationship, she controlled for inflation. (Stiroh Report at ¶ 58 & n. 90). Dr. Stiroh also controlled for the fact that clear lenses are a component of photochromic lenses. (*Id.*).

## iii. Data Used

In conducting both analyses, Dr. Stiroh relies on historical sales information for clear and photochromic lenses published by the Vision Council Association. (Stiroh Report at ¶ 54). The data provides monthly average prices. (*Id.*).

The sales reflected in the Vision Council Association data are sales from lens casters to retailers. (*See* D.I. 158 at 21). As the following diagram illustrates, Defendant Transitions Optical ("TOI" in the diagram) purchases clear lenses from lens casters, applies photochromic treatment to them, and then sells the treated lenses back to lens casters. Lens casters then sell the treated lenses to labs and retailers.

10



Plaintiff, in the briefing, criticizes Dr. Stiroh's use of data reflecting sales from lens casters to retailers as focusing on the wrong level of the market. (D.I. 40 at 18–24).

11

## B. Plaintiff's Challenge

Plaintiff does not challenge the methodological soundness of cross-price elasticity and co-price movement. Instead, Plaintiff challenges the appropriateness of those tests for this case. More specifically, Plaintiff challenges Dr. Stiroh's use of Vision Council Association's average price data as inappropriate when, as in this case, there is a dispute whether Defendant was charging competitive or supracompetitive prices during the relevant time. The competitive price is the price that would be charged in a competitive market. Plaintiff's theory, however, is that Defendant was already a monopolist, there was not a competitive market, and therefore Defendant could and was charging supracompetitive prices, that is, prices above competitive prices.

### i. *The* Cellophane *Fallacy*

Because Dr. Stiroh uses actual, or prevailing, prices in her analysis, Plaintiff accuses her of committing the *Cellophane* fallacy. The *Cellophane* fallacy gets its name from the Supreme Court case of *United States v. E.I. du Pont de Nemours* ("*DuPont*"), 351 U.S. 377 (1956). In that case, DuPont was accused of exercising monopoly power in its sale of cellophane. The Court found that DuPont lacked the requisite market power because cellophane was part of a broader market of flexible packaging materials that included glassine, wax paper, and aluminum foil. The Court relied on a cross-price elasticity of demand analysis performed on prevailing prices to determine these other materials were substitutes. *DuPont*, 397 U.S. at

12

400. The Court arrived at the conclusion they were substitutes because any increase in the price of cellophane would lead to substitution away from cellophane to other packaging materials. *Id.*

Economists have criticized the Court's analysis for failing to account for the possibility that DuPont had already exercised its monopoly power to charge a supracompetitive price, *i.e.*, a price above the competitive price. *E.g.*, Hovenkamp, *supra*, § 3.4b; Posner, *supra*, 150; Landes and Posner, 94 Harv. L. Rev. at 961; (D.I. 44-5 at 22) (NERA Report). As Posner explained, "at a high enough price, even poor substitutes look good to the consumer." Posner, *supra*, 150. At the inflated supracompetitive price, consumers will substitute to products they would not substitute to at a competitive price. Thus, if DuPont were a monopolist and were charging monopoly prices, then an increase in price would have led to substitution from cellophane towards wax paper even if wax paper were not a substitute in a competitive market.

Despite these academic criticisms, Dr. Stiroh's testimony is admissible. As Dr. Stiroh explained at the hearing, the analysis she performed can be characterized as necessary to show that clear and photochromic lenses are in the same market, even if not sufficient to do so. If co-price movement and cross-price elasticity of demand showed no correlation, then Dr. Stiroh would be hard pressed to say clear and photochromic lenses were substitutes. While these analyses may not score a touchdown, they move the ball down the field.

I do not believe Dr. Stiroh's use of prevailing price data is flawed, but even if I did, I think the analyses would still offer some probative value. *See Paoli*, 35 F.3d at 744–45. Further, they are not of a type particularly likely to confuse the jury. Thus, Dr. Stiroh is generally permitted to testify on co-price movement and cross-price elasticity of demand.

## ii. *Common Components of Clear and Photochromic Lenses*

While Dr. Stiroh's co-price movement testimony is generally admissible, she is limited to her conclusions that account for the fact that clear lenses are a component of photochromic lenses. Photochromic lenses are made by applying a treatment to clear lenses. Thus clear lenses and photochromic lenses largely share the same components. Therefore, price fluctuations attributable to production costs of clear lenses do not speak to whether clear lenses and photochromic lenses are in the same market.

Dr. Stiroh acknowledges that the common components of clear and photochromic lenses can improperly skew the co-price movement analysis. (Stiroh Report at ¶¶ 55, 58, 58 n.90). To correct for this, she performed an analysis that controlled for the commonality. (*Id.* at ¶ 58 n. 90). This produced a lower but still statistically significant relationship. (*Id.*) She can rely on that relationship in her testimony.

Dr. Stiroh cannot rely on the co-price movement she attributes to common components of clear and photochromic lenses. That relationship has no relevance to

14

the question of whether clear and photochromic lenses are in the same market. Further, allowing her to use analysis that reflects market influences related to common components of clear and photochromic lenses would inflate the relationship, bolstering it and thereby unfairly prejudicing Plaintiff.

### iii. Level of the Market

Plaintiff criticizes Dr. Stiroh for analyzing cross-price elasticity of demand and co-price movement where lens casters sell to labs and integrated retailers (the "downstream" market) instead of where Defendant sells treated lenses to lens casters (the "upstream" market). (D.I. 40 at 18–21). Plaintiff further criticizes Dr. Stiroh for failing to perform "well-known calculations that would have translated her findings about downstream elasticities to the upstream elasticities...." (*Id.* at 21–24). Plaintiff asserts that "[Defendant] is alleged to have monopolized the market" at the upstream level. (*Id.* at 18). Thus, according to Plaintiff, Dr. Stiroh is required to perform calculations on substitution upstream.

I am unconvinced that Dr. Stiroh's analysis of sales to labs and integrated retailers is not relevant to this case. At the *Daubert* hearing, Dr. Stiroh explained that "when the lens casters have a collection of photochromic and clear lenses to sell to their customers, that's where the substitution between one and the other would take place...." (D.I. 158 at 22). While Plaintiff asserts that Defendant is accused of monopolizing the upstream market, their case vertically spans the entire market. *See infra* at III.A. Defendant's alleged exclusionary practices in the downstream

15

market are integral to Plaintiff's anti-competitive conduct case. Thus, substitution downstream is a relevant analysis.

With the exception of the stated limitations on co-price movement, Dr. Stiroh's testimony is admissible and Plaintiff's challenges are rejected.

## III. DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S COMPETITIVE HARM THEORY

Plaintiff proffers the testimony of experts Kenneth Baseman and Donald Nicholson. Mr. Baseman holds a bachelor's and master's degree in economics and is employed as a consultant in the subject. (D.I. 48-2 at 11, 122). He worked for the Antitrust Division at the Department of Justice as an economist for eight years. (*Id.*). For the past twenty-one years, he has worked for Microeconomic Consulting and Research Associates, Inc. (*Id.*). He is currently employed there as a principal. (*Id.*).

Mr. Nicholson holds a B.S. in Accounting from the University of Minnesota and is a certified public accountant. (D.I. 48-3 at 136–38). He is a partner at Arthur Anderson LLP, a business consulting firm. (*Id.*). Mr. Nicholson has worked in finance since 1980. (*Id.*).

### A. The Proffered Testimony

In broad strokes, Mr. Baseman is expected to testify that Defendant engaged in anti-competitive conduct by foreclosing, fully or partially, much of the photochromic lens market with exclusive agreements, retaliatory conduct, and loyalty contracts. In antitrust analysis, market foreclosure represents the part of

16

the market from which an accused monopolist has excluded competition. *See* Hovenkamp, *supra*, § 10.9a.

According to the Court's reading of Mr. Baseman's expert report, the exclusivity agreements and loyalty contracts covered the market as follows:



Mr. Baseman has also constructed a damages model based on a hypothetical world where Defendant's allegedly anti-competitive behavior did not occur. Mr. Nicholson has taken Mr. Baseman's damages model and calculated damages.

## B. Defendant's Challenge

Defendant lodges several challenges to Mr. Baseman's anti-competitive conduct opinion and damages model. Defendant also challenges Mr. Nicholson's damages opinion. I will discuss and resolve each in turn.[3]

### i. *Foreclosure and the Equally Efficient Competitor*

Defendant renews its argument that Mr. Baseman's anti-competitive conduct opinion fails because he has not demonstrated that Defendant's conduct would exclude an equally efficient competitor. I rejected this argument in my summary judgment order when I rejected the price-cost test. (D.I. 141 at 12; *see also* D.I. 150 at 2–3). That was the appropriate forum for the argument, as indicated by Defendant's reliance on cases reviewing merits decisions. (*See* D.I. 46 at 19 (citing *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394 (3d Cir. 2016) (summary

---

[3] Defendant makes two arguments I already resolved at summary judgment. First, Defendant argues that Mr. Baseman's competitive harm theory is deficient because he does not prove consumer harm. (D.I. 46 at 16–17; D.I. 174 at 24–25). I already rejected Defendant's argument that Plaintiff lacked evidence to show competitive harm. (D.I. 141 at 13, 20, 20–24). Second, Defendant challenges Plaintiff's tax theory. (D.I. 174 at 7 (incorporating be reference the tax theory argument at D.I. 46 at 22–23)). Again, I rejected this challenge at summary judgment. (D.I. 141 at 15–16).

18

judgment); *Z.F. Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) (judgment as a matter of law); *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) (summary judgment); *Barry Wright Corp. v. Pac. Scientific Corp.*, 724 F.2d 227 (1st Cir. 1983) (trial opinion)); *see also* D.I. 174 at 19–20 (relying on same cases)).

Defendant tries to shoehorn the equally efficient competitor test into a *Daubert* argument by saying no economist would testify a market was foreclosed without performing an equally efficient competitor analysis. (*See* D.I. 174 at 20). It cites no *Daubert* opinion supporting this position, and the Third Circuit's summary judgment cases do not support it.

For example, Defendant claims the court in *Z.F. Meritor* conducted an equally efficient competitor analysis. (*See* D.I. 46 at 19). In that case, however, the court upheld a jury verdict where the accused monopolist offered "lower," but above cost, prices. *Z.F. Meritor*, 696 F.3d at 266–67, 303. In assessing the sufficiency of the evidence, the court did not consider whether the competitor plaintiff was equally efficient. *See id.* at 286–89. Further, in the very part of the case Defendant cites, the court explains the antitrust law's concern with not only exclusion of equally efficient competitors, but also exclusion of "*potentially* equally efficient[] rivals...." *Id.* at 281 (emphasis added).

Defendant has failed to show that an antitrust plaintiff must prove it is an equally efficient competitive in order to have its expert testify on market

foreclosure. Thus, Defendant's challenge is rejected, and Mr. Baseman can testify to foreclosure.

### ii. *Retail Channel Gerrymandering*

Mr. Baseman used the Vision Monday's Top 50 Optical Retailers list to calculate the extent to which Defendant's exclusivity and loyalty contracts foreclosed the retail channel. (Baseman Report[4] at ¶ 95). Mr. Baseman excluded Walmart and Luxxotica,[5] the number one and number two lens retailers. (*Id.*). Defendant challenges both of these moves as Mr. Baseman "gerrymandering" the retail channel to inflate his foreclosure conclusions. (D.I. 46 at 21–22; D.I. 174 at 23–24).

Mr. Baseman is permitted to rely on Vision Monday's list of the top 50 optical retailers. Plaintiff presented unrebutted testimony from Vision-Ease's Director of Marketing that the list represents about ninety percent of the total retail channel and is "a widely used surrogate for the retail channel." (D.I. 59 at ¶ 17).

Defendant cites to a statement in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde* directing Plaintiff to the "market as a whole..." for support. (*See* D.I. 46 at 21

---

[4] Mr. Baseman's initial report is available at D.I. 48-2.
[5] Luxxotica is the parent company of Lenscrafters.

(quoting 466 U.S. 2, 31 (1986))). That statement related, however, to the Supreme Court's dictate that an antitrust plaintiff cannot argue a single exclusionary act without considering its context in the broader market. 466 U.S. at 31. Devoid of context, this statement appears to support Defendant's position; in context, it is irrelevant.

As for excising Walmart and Luxxotica, conveniently the two retailers that carried Plaintiff's product, Mr. Baseman explains the two retailers "are exceptional not only because [Vision-Ease] gained entry at those accounts, but also because those accounts, alone among all national retail accounts, never accepted exclusivity with [Transitions Optical], even though [Transitions Optical] asked for it." (Baseman Report at ¶ 239 n. 430). That explanation is unavailing.

Excluding Walmart and Luxxotica is completely arbitrary, and Plaintiff has failed to point to any rational economic theory or methodological reason for excluding those two retailers. It is not enough that excluding Walmart and Luxxotica makes Plaintiff's case look better. Thus, Mr. Baseman is confined to opining on foreclosure in the Top 50 optical retailers as a whole.

### iii. Supply Termination

In 2005, Defendant terminated its thirteen-year-old contract with Plaintiff under which Plaintiff bought photochromic lenses from Defendant. (D.I. 141 at 29). The same year, Plaintiff launched its own photochromic lens product. On the basis of those facts and others, Plaintiff brought a refusal to deal claim. A company is

21

subject to antitrust liability when it terminates a "voluntary and profitable course of dealing, forsaking short-term profits to achieve an anti-competitive end...." (*Id.* at 29 (citing *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)). I granted summary judgment on Plaintiff's refusal to deal claim because a refusal to deal claim is "narrow" and the evidence Plaintiff produced did not fit in that narrow exception. (*Id.* at 28–30).

Defendant argues that this ruling requires that Mr. Baseman excise from his analysis all reference to the termination of the contract. (D.I. 174 at 10). Mr. Baseman, however, has a valid theory that includes the supply termination as anti-competitive conduct independent of the refusal to deal claim. Mr. Baseman opines that Defendant's termination of Plaintiff and other clients that produced their own photochromic product reinforced its exclusive contracts, describing it as a "synergistic exclusionary effect[]...." (Baseman Report at ¶¶ 218–19). Thus, Mr. Baseman is permitted to incorporate the supply termination in his opinion on anti-competitive conduct. *See Z.F. Meritor*, 696 F.3d at 272 ("Courts will also consider whether there is evidence that the dominant firm engaged in coercive behavior....").

As it is a proper part of Plaintiff's anti-competitive conduct theory, and not contradictory of my summary judgment ruling, the supply termination can be presented in Mr. Baseman's anti-competitive conduct testimony and included in his damages model.

### iv. *Forty Store Hypothetical*

When Plaintiff introduced its photochromic product at Lenscrafters, it did a

full launch at all 800+ Lenscrafters stores. Following the launch, Plaintiff's product

suffered delamination, a serious product quality issue, which ultimately harmed the

relationship between Plaintiff and Lenscrafters's parent company, Luxxotica, and

harmed Plaintiff's reputation. In constructing a damages model, Mr. Baseman

hypothesizes that, but for Defendant's allegedly anti-competitive conduct, Plaintiff

would have started with a smaller forty store roll out, caught the product defect,

fixed it, and avoided the reputational and relationship harms.

Defendant challenges this assumption. (D.I. 46 at 26–28; D.I. 174 at 11–14).

Defendant argues there is a dearth of evidence supporting it. In essence,

Defendant's argument is a fit one. I share Defendant's skepticism towards the forty

store hypothetical, as I noted in my summary judgment opinion. (D.I. 141 at 26 fn.

5).[6] Plaintiff, however, has now pointed to evidence sufficient to provide a factual

basis to support Mr. Baseman's damages model. Specifically, Mr. Baseman relied on

---

[6] At the *Daubert* hearing, I ordered Mr. Baseman to prepare an alternative damages theory in anticipation of excluding the forty store hypothetical. As I am admitting the forty store hypothetical, it will be Plaintiff's decision whether to present the alternatives to the jury as well. Defendant has filed another *Daubert* motion challenging the alternative damages report. (D.I. 194). I will address that motion by separate opinion.

23

the expected testimony of Plaintiff's CEO, Doug Hepper, and its head of research and development. Derek Harris, Lenscrafters's history of conducting targeted roll outs, and the rate of delamination. (Baseman Supp. Report[7] at ¶¶ 15–28).

Defendant also challenges Plaintiff's reliance on the expected testimony of Mr. Hepper. Defendant argues it is not the type of evidence an economist would rely on. I find it an unconvincing argument that an economist, in hypothesizing on the potential business decisions of a certain company, would not rely on the expertise and experience of the head of said company in constructing a "but for" world. Thus, Mr. Baseman is permitted to present his damages model incorporating the forty store hypothetical to the jury.

While Mr. Baseman can rely on the assumption that a forty store roll out would have occurred in explaining his damages model, he cannot opine that Plaintiff would have, in fact, conducted the forty store roll out. Plaintiff has not established Mr. Baseman as an expert for that purpose. The basis for his assumption will have to be presented by fact witnesses such as Mr. Hepper and Mr. Harris.

---

[7] Mr. Baseman's supplemental report is available at D.I. 182-1.

### *v. Market Share*

In constructing his damages model, Mr. Baseman hypothesizes that Plaintiff would reach a twenty percent market share. (Baseman Report at ¶¶ 303–06). Defendant challenges this conclusion as unfounded. (D.I. 46 at 29–30; D.I. 174 at 14–17).

In reaching this conclusion, Mr. Baseman looked at economic literature describing other industries to determine the second place firm reaches at least a twenty percent market share. (Baseman Report at ¶¶ 303–06; D.I. 157 at 45). He then concluded that Plaintiff would reach second place status because of Plaintiff's actual experience, Defendant's response to Plaintiff's entry into the market, and Plaintiff's product offerings. (Baseman Report at ¶ 307; D.I. 157 at 44).

When it entered the market, Plaintiff "quickly became the second largest seller of photochromic lenses" domestically. (Baseman Report at ¶ 307). Plaintiff was also "the only rival whose presence led [Defendant's] management to approve exceptions to (i.e. discounts off) its prevailing standard prices." (*Id.*). Mr. Baseman's review of internal documents showed what he characterized as "a singular concern about [Plaintiff]... and nothing like that for anybody else." (D.I. 157 at 44).

Mr. Baseman further based his market share opinion on Plaintiff's unique product offering. Bifocal polycarbonate lenses were about twenty percent of the overall lens market and Plaintiff was the only firm offering a polycarbonate bifocal lens with photochromic treatment. (D.I. 157 at 46). This supports his market share

opinion because Plaintiff was the only supplier offering photochromic treatment to a common type of lens. Mr. Baseman testified that at least ten percent of the projected market share could be attributed directly to Plaintiff's offering of bifocal polycarbonate lenses alone. *(Id.)*.

Mr. Baseman's analysis, determining a firm's likely market position based on product offerings, past performance, and extrinsic evidence of how a competitor perceived the market as well as extrapolating a market share model from looking at "hundreds" of other industries (D.I. 157 at 45), is reliable and grounded in facts. Thus, his model fits the case.

  *vi.*   *Mr. Nicholson's Damage Calculations*

Defendant challenges Mr. Nicholson's damage calculations on two grounds.[8] First, Defendant argues they fall with Mr. Baseman's opinion since they rely on it. I have upheld relevant portions of Mr. Baseman's damages model, making this argument moot.

Second, Defendant challenges the factual basis of Mr. Nicholson's projection of Plaintiff's sales from 2012 to 2015, which Mr. Nicholson used to calculate future

---

[8] Defendant requested the opportunity to supplement the record on this and other arguments. (D.I. 209). That request, as it pertains to this motion, is denied. Defendant has had more than ample opportunity to submit relevant material to the Court.

damages. Because the parties agreed to end discovery at 2011 (D.I. 166 at 22 n. 12),

Mr. Nicholson relied on a model Plaintiff "used for business planning and financing

purposes...." (Nicholson Report[9] at 121; *see also* D.I. 58 at ¶ 54 ("The sales

projections... were maintained by [Vision-Ease]'s Chief Financial Officer, Rich

Faber, and were the most up-to-date projections that [Vision-Ease] had developed

for its own business purposes, which included providing the projections to lenders

and potential purchasers of the company.")). The document Mr. Nicholson relied on

is highly detailed. (D.I. 101).

Defendant relies on *Z.F. Meritor*. In *Z.F. Meritor*, the Third Circuit found it

was not an abuse of discretion when the district court excluded damages projections

based on a "one-page set of profit and volume projections" without knowing how

those projections came to be. 696 F.3d at 292. The information relied on here is not

so summary. Further, *Z.F. Meritor* requires an expert to explain "why he relied on

such estimates and must demonstrate why he believe the estimates were reliable."

*Id.* Mr. Nicholson did just that when he explained that the estimates were actually

used in the course of business and incorporated actual sales data. (D.I. 48-3 at 121).

---

[9] Mr. Nicholson's initial report can be found at D.I. 48-3.

Thus, Mr. Nicholson's proffered testimony is admissible.[10]

## IV. CONCLUSION

Dr. Stiroh's testimony is permitted but for the exceptions noted in the analysis. Similarly, Mr. Baseman's testimony is permitted but for the exceptions noted in the analysis. Mr. Nicholson's testimony is permitted in full. An order consistent with this opinion will follow.

---

[10] Defendant also challenges Mr. Nicholson's damages calculations for failing to account for other entrants to the market as well as "financial mismanagement and natural disasters...." (D.I. 46 at 31–32; D.I. 174 at 18). To the extent this is a challenge to Mr. Baseman's but-for damages model itself, the criticism is inapropos. Mr. Nicholson is not the expert offering the model; he is the expert implementing it. If Defendant wanted to challenge the damages model on this ground, it should have done so in its already comprehensive motion to exclude Mr. Baseman's testimony. To the extent this challenge is properly aimed at Mr. Nicholson's analysis, I will address it by separate opinion. My admission of Mr. Nicholson's testimony is contingent on addressing this further objection.